# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### January 6, 2015 Session

## STATE OF TENNESSEE v. GREGORY NELSON AND TINA NELSON

**Appeal from the Circuit Court for Lauderdale County**
**No. 9132    Joseph H. Walker, III, Judge**

_____

**No. W2014-00494-CCA-R3-CD (C)  -  Filed May 5, 2015**

_____

A Lauderdale County jury convicted the Defendant-Appellants, Gregory Nelson and Tina Nelson, of the charged offenses of first degree felony murder during the perpetration of aggravated child abuse and aggravated child abuse.  Tina Nelson was sentenced to life imprisonment for the first degree felony murder conviction and to fifteen years for the aggravated child abuse conviction, and Gregory Nelson was sentenced to life imprisonment for the first degree murder conviction and to twenty years for the aggravated child abuse conviction.  In this consolidated appeal, Gregory[1] and Tina Nelson argue that the evidence is insufficient to sustain their convictions.  Upon review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which ALAN E. GLENN and ROGER A. PAGE, JJ., joined.

James E. Lanier, District Public Defender; and David S. Stockton, Assistant Public Defender, Somerville, Tennessee, for the Defendant-Appellant, Gregory Nelson.

Lyle A. Jones, Covington, Tennessee, for the Defendant-Appellant, Tina Nelson.

Robert E. Cooper, Attorney General and Reporter; Jonathan H. Wardle, Assistant Attorney General; D. Michael Dunavant, District Attorney General; and Julie K. Pillow, Assistant District Attorney General, for the Appellee, State of Tennessee.

---

[1] Because the Defendant-Appellants share the same last name, we will occasionally refer to them by their first names in this opinion.  We intend no disrespect in doing so.

**OPINION**

The victim, E.N.,[2] Gregory and Tina Nelson's two-and-a-half-month-old daughter, died on May 11, 2011. At the time of her death, the victim had brain hemorrhages, a retinal hemorrhage in one eye, optic hemorrhages behind both eyes, and multiple broken ribs. The autopsy report stated that the victim's cause of death was homicide from a closed head injury and that the victim's numerous injuries were not from natural causes. Gregory and Tina Nelson, who were unable to sufficiently explain the cause of the victim's extensive injuries, were subsequently indicted for first degree felony murder and aggravated child abuse.

**Trial.** William Freeman, an emergency medical technician (EMT), testified that on May 11, 2011, he responded to a call from the Nelsons' residence that their infant was not breathing. The original call came in at 7:07 a.m., and the ambulance arrived at the Nelsons' home at 7:18 a.m. When Freeman arrived, Tina Nelson handed him the victim, who was "obviously lifeless[.]" He and another EMT took the victim to the ambulance to conduct CPR, place her on a monitor, and evaluate her. They ventilated the victim for several minutes until they determined that she had died. During this time, the victim never had any cardiac activity and never took a breath. Freeman said the victim had nothing blocking her airway. He was surprised to learn that the victim was two and a half months old because she appeared to be substantially younger based on her size.

Freeman stated that Tina Nelson was "pretty much hysterical" when he first made contact with her. Once he and the other EMT disclosed that the victim had passed away, Mr. Nelson became upset because he thought they "should have gotten there sooner" and "had to be restrained by one of the Haywood County officers." Freeman stated that as they were working on the victim, neither Tina nor Gregory Nelson ever came to the ambulance to check on her. Once he informed them that their baby had passed away, the Nelsons' family arrived. At that point, Gregory and Tina Nelson went to a family member's car, where they were "smoking cigarettes, laughing, cutting up, just as though nothing had happened." He described their behavior as "unusual." He stated that the Nelsons never asked to see the victim while he was at their residence.

Steve Sanders, the Sheriff of Lauderdale County, testified that he was also present at the Nelsons' home on May 11, 2011. He described Gregory's and Tina's demeanor as calm. Tina told him that the victim, upon waking, began crying and that she got her out of the crib and placed her on the mattress on the floor. She fixed a bottle, gave it to the victim, and walked away. When she returned, the victim was unresponsive. She then screamed to her husband, Gregory Nelson, and he made the 9-1-1 call. Tina also told Sheriff Sanders that they noticed the victim breathing heavily around 8:00 p.m. the

---

[2] It is this court's policy to use initials when referring to minor victims and their minor siblings.

- 2 -

previous night. When he examined the victim's body, he noticed a red mark that appeared to be a birth mark on the victim's lower back but did not see any bruises or any other marks.

Cheryl Manns, the custodian of the records at the Lauderdale Community Hospital, testified that the hospital's records showed that the victim, who was dead on arrival at the hospital, had been suffering from a cold for the last two days, had experienced decreased appetite, and had been taking amoxicillin that had been prescribed by a physician. The records also showed that the victim stopped breathing because she began choking during a feeding and that the victim's father attempted CPR. The records noted a "small scab defect to [the victim's] right nose." They also contained the following information about the victim: "Recently seen, treated by doctor. EMS called at 7:07 [a.m.]. Per family states child not breathing at 6:45 [a.m.]. Called family first to get car, then called EMS." Manns conceded that she could not testify as to whether the information contained in the hospital's records was true or false, only that this information was found within the records.

Dr. Miguel Laboy, a medical examiner for the Shelby County and West Tennessee Regional Forensic Center, testified as an expert in the field of forensic pathology. Dr. Laboy stated that he performed the victim's autopsy on May 12, 2011, the day after her death. After performing an external examination, Dr. Laboy determined that the victim, who was two-and-a-half months old at the time of her death, weighed 6.5 pounds and was small for her age. He also observed a very small abrasion on the victim's nose and a half-inch by quarter-inch dark brown bruise under her right jaw. He stated that it was unusual to see a bruise under the jaw of an infant because that is a not a prominent area of the body, explaining, "[If] someone drop[s] her or they fall and [get] scrape[d], usually they're going to hit the prominent things like the forehead or the eyebrows or the cheeks, the sides of the jaw. [The area under the jaw is] an area that's kind of protected[.]"

Upon conducting the internal examination, he did not find any evidence of bruises on the victim's scalp. However, he did find "a thin layer of subdural hemorrhage in the right inner aspect with blood clots and yellow-green coloration," as well as a "hemorrhage on the left side with also yellow or golden coloration." In addition, he observed a "a patchy subarachnoid hemorrhage and yellow discoloration obvious on the right parietal lobe [at the top of the victim's head]." He explained that there was blood accumulation between the thick membrane under the skull and the brain. There were also patchy areas of the brain that had different blood accumulations. He said the areas of "yellow-golden discoloration" were caused by multiple bruises that had occurred in the past. He also found subdural hemorrhages that were recent injuries that showed "yellow-golden" and "yellow, orange, golden" on the parietal lobe. These subdural hemorrhages showed "areas of recent bleeding and old bleeding that was reabsorbing." He also saw

areas of recent bleeding and old bleeding that were reabsorbing in the subarachnoid hemorrhage, which was on the back of the brain.

Dr. Laboy stated that although there could be natural or traumatic causes for hemorrhages of this type, he did not find any natural causes for the victim's brain hemorrhages and concluded that they were from a "traumatic injury." He also reviewed the victim's medical records and found nothing that would indicate that these hemorrhages were from natural causes.

In addition to the victim's brain hemorrhages, Dr. Laboy found recent "perioptic hemorrhage[s]" between the sheath and the optic nerve of both eyeballs. He stated that perioptic hemorrhages are caused when there is a traumatic injury that increases the pressure, causing the brain to collapse and blood to accumulate in that area. In addition, he noted that the victim's left eye had a recent retinal hemorrhage, a hemorrhage inside the eye, that was also caused by traumatic injury. Dr. Laboy did not find any solid mass that could have caused the victim to choke. He said that liquid, like milk or formula, would not cause a choking death in an infant, although it might cause the infant to cough, throw up, or react in some way. There was no visible milk in the victim's lungs or bronchial tubes, and there was no evidence that the victim suffered a choking death.

Dr. Laboy also examined the victim's skeletal system and found healing fractures on six ribs on the left lateral side and healing fractures on eight ribs on the left posterior side. He also found healing fractures on five ribs on the right lateral side. Dr. Laboy stated that these fractures were healing with calluses, and there was a recent refracture in the ninth left posterior rib with blood around it. He asserted that posterior refractures in infants are "more consistent with some inflicted trauma" rather than accidental trauma and that the victim's fractured ribs were consistent with a squeezing type of inflicted trauma. Because the rib fractures were in the process of healing, he concluded they were probably less than a month old. Dr. Laboy acknowledged that because all the rib fractures, except the most recent fracture, looked microscopically the same, they could have been the result of a single event. He opined that the victim's bones were normal and not brittle.

When Dr. Laboy examined the victim's lungs, he found that the victim had chronic bronchiolitis that had been going on for weeks. He also determined that the victim had a recent pneumonia occurrence that had been going on for the last day or few days. He explained that multiple rib fractures cause pain, which can affect breathing and can make a person more likely to develop pneumonia. Dr. Laboy also stated that an infant with a brain injury is more likely to develop pneumonia.

Dr. Laboy concluded that the bruise underneath the victim's jaw was a recent injury because his examination of that area did not show any "recent breakdown of the red blood cells[.]" However, he acknowledged that administering CPR on a dead body could cause a bruise by impacting, stretching, or pinching an area by artificially making the heart pump.

Dr. Laboy opined that the victim's cause of death was a closed head injury. He explained that death results from a closed head injury when the inflammation becomes so great that it damages the brain. While he noted that an infant can survive trauma to the brain, in this case, the victim had evidence of an old brain injury and then a rebleeding over that area that likely caused the victim's death. He stated that the victim could have had an aneurysm, a seizure, or could have died from an inability to get oxygen because of a problem in the lungs. He stated that it was unlikely that the victim's brain injuries were more than a month to a month and a half old.

Dr. Laboy noted in his report that "the finding of rib fractures raises the index of suspicion that the acute intracranial hemorrhage is traumatic in nature." After reviewing the victim's histology, cultures, rib fractures, toxicology reports, and after consulting with a neuropathologist, Dr. Laboy concluded that the brain hemorrhages and retinal hemorrhages were not from natural causes. He stated that his autopsy was more accurate than either an MRI or an Ultrasound. Dr. Laboy opined that the areas showing reabsorption of blood on the subarachnoid space had been there longer than two or three days but not longer than a few weeks. He also stated that there were areas of recent hemorrhaging in the subarachnoid space. He acknowledged that there was no bruising on the scalp, no skull fractures, and no upper neck injuries. While he admitted that there could be natural causes for a subdural hemorrhage or subarachnoid hemorrhage, he did not see any evidence that these injuries were from natural causes. He said that natural causes for these hemorrhages would include a vascular malformation that breaks and bleeds into the subarachnoid space or subdural space, tumors that bleed out to these areas, tumors in the dura that bleed, problems with coagulation, and mutations that affect the brain. Dr. Laboy acknowledged that Tina Nelson would not have known about these brain hemorrhages because they were internal injuries. He also acknowledged that the hemorrhaging around the victim's perioptic nerve would not be visible to Tina Nelson because a person would have to dilate the eye and look inside it to see these injuries.

When asked if the victim's posterior rib fractures could have occurred if someone was holding the victim and fell or was knocked down, Dr. Laboy stated, "The scenarios can be multiple, so you have to give [me] more specific [details], where they land, how they fall, one side, front, actually bending the arms and crushing the infant." When asked if he knew how the rib fractures occurred, Dr. Laboy stated that the fractures "were from any trauma that compressed [the ribs] and fractured [them]."

Dr. Laboy acknowledged that at the time of the autopsy, which was one day after the victim's death, there were no external signs of force or trauma on the victim's head. However, he said that if an infant were thrown forcefully onto something soft, like a mattress on the floor, it would not be unusual not to see any external bruising. He also stated that it was possible for the victim to have had external bruising when these injuries occurred, and these bruises had healed over time. Dr. Laboy noted that when the treating physicians performed an MRI on the victim, the results were normal. He added that the symptoms of seizures, respiratory problems, lethargy, and loss of appetite would be indicators that a parent should take the child to a doctor or to the emergency room.

Pat Harwell, the custodian of records for the Jackson-Madison County General Hospital, testified that the victim was admitted to the hospital on February 21, 2011, and was discharged on March 7, 2011. The social service notes stated that Tina Nelson, who appeared "mildly mentally retarded,"[3] had "been disabled since birth and receive[d] SSI." The report also noted that Tina Nelson's husband, Gregory Nelson, "appear[ed] somewhat developmentally delayed but state[d] he [was] not disabled." The notes showed that Tina and Gregory Nelson had a "five-year-old daughter, [B.N.,]" who lived with them and that Gregory Nelson's severely mentally retarded brother also lived with them. The parents disclosed that they had no income other than the social security disability checks and the money that Gregory earned from odd jobs around town and that neither one of them was able to drive. The reports showed that Tina Nelson could not read or write.

The reports from February 23, 2011, showed that Gregory Nelson had said he and Tina needed to return home as soon as possible because their family was fighting in their father's home where their five-year-old daughter was staying. Transportation was notified to take Tina and Gregory Nelson home that morning. The Department of Children's Services (DCS) was given a "verbal referral requesting a home evaluation prior to [the victim's] discharge" from the neonatal unit and requesting a "safety plan."

The reports from February 24, 2011, stated that Gregory Nelson informed the staff he would be unable to receive training and teaching because they had no family to keep their five-year-old child while they were at the hospital. The staff member noted that she was concerned about Gregory Nelson not attending the training because Tina Nelson was illiterate. This staff member contacted Zandra Carter-Mann, a DCS worker in Lauderdale County, who stated that she knew the Nelsons. She "made arrangements for [a] child-family team meeting" with the parents and asked that the staff member and the neonatal nurse participate in the meeting over the phone.

---

[3] Pursuant to the Tennessee Supreme Court's opinion in Coleman v. State, 341 S.W.3d 221, 226 n.5 (Tenn. 2011), and the recently amended Tennessee Code Annotated section 39-13-203 (2010), we will use the term "intellectual disability" rather than "mental retardation" except in quoted material.

The reports from March 2, 2011, showed that after conducting the team meeting over the phone, "it was determined by DCS that [the] mother, father will be required to visit and bond with newborn at least two times a week prior to the time to start rooming in." DCS planned to monitor Tina's and Gregory's visits with the victim. The reports from March 4, 2011, established that Tina and Gregory Nelson arrived at the Neonatal ICU at 8:00 a.m. to stay the weekend and that they had "positive involvement with the newborn[.]"

Harwell acknowledged that the victim had been diagnosed with "intrauterine growth retardation," which meant that the victim had not grown at a normal rate inside the womb. She stated that one of the treating physicians ordered a cranial ultrasound for the victim, and another physician ordered an MRI. The victim's cranial ultrasound showed "[n]o gross evidence of intracranial hemorrhage" and listed the following as an "impression":

> Contour irregularity in the roof of the left lateral ventricle is nonspecific. This may be an unusual location for hemorrhage. This could be a soft tissue nodule versus maybe ectopic grey matter. Follow[]up examination is recommended.

The nursing notes from March 4, 2011, stated that the victim's heart rate dropped to 62 beats per minute. When the nurse explained that the drop in the victim's heart rate could extend her stay at the hospital, Tina and Gregory Nelson stated that they could not afford to repeatedly make trips to the hospital.

Zandra Carter-Mann, an employee at the Lauderdale County DCS, testified that she received a referral from the Jackson-Madison County Hospital regarding the victim and the victim's five-year-old sister. The hospital staff were concerned about whether Tina and Gregory Nelson would be able to meet the children's needs. Because the victim was born prematurely, the staff wanted the parents to be trained on CPR and wanted to ensure that they knew what to do if the victim had respiratory problems. She explained that in these situations, the parents must receive training before the infant is discharged from the hospital. Carter-Mann stated that after Tina Nelson was discharged from the hospital on February 23, 2011, neither she nor Gregory Nelson visited the victim and claimed they could not visit because they did not have transportation and were unable to find someone to care for their five-year-old child. As a result, DCS informed the Nelsons that they would have to visit and bond with the victim and learn to care for her before DCS would allow the victim to go home with them.

Carter-Mann stated that she met with Tina and Gregory Nelson at the Nelsons' home on February 24, 2011, to inform them of the things they needed to do in order to

take the victim home and to assess whether they had the necessary supplies in order to properly care for her. At the time, Gregory Nelson was upset because he did not understand why DCS was involved. Carter-Mann was aware that Gregory Nelson had previously become aggressive with the hospital staff. She stated that the Nelsons had baby supplies that had been donated by a church but did not yet have a car seat that was the right size for a premature baby.

While Carter-Mann acknowledged that Tina Nelson was developmentally delayed, she said Tina was able to sign DCS paperwork, to participate in meetings, and to schedule appointments for her children. Carter-Mann stated that if Tina Nelson had told the hospital staff that she could not read or write, this information was inaccurate based on her interaction with her. She believed that when Tina and Gregory Nelson worked together, they were capable of taking care of the victim and their older child. During her meetings, Gregory Nelson often became upset and verbally aggressive and would state that he was going to refuse to answer questions. He would also tell his wife not to answer their questions, and she would comply. Tina would defend her husband's aggressiveness and would provide excuses for why they were unable to do the things DCS asked of them.

After the February 24, 2011 meeting, Carter-Mann tried to visit with the Nelsons every two weeks so that she could assist them with anything they needed. During these unannounced visits, she entered the Nelsons' home. Carter-Mann stated that the Nelsons did not allow their children to be kept by family members and that Gregory was combative and did not have a good relationship with his family. She could not recall a time that the victim stayed with anyone other than Tina and Gregory Nelson. During her visits, the victim was always dressed appropriately and was always sleeping. At her last visit, she noted that the victim was gaining weight.

In April 2011, a juvenile court staff member notified DCS about some concerns they had about the victim. Carter-Mann conducted a home visit the next day, and the Nelsons agreed to take the child to the pediatrician to ensure that there was nothing seriously wrong with her. During her home visits with the Nelsons from February until early May, the only individuals living in the home were Tina and Gregory Nelson, their older daughter, and the victim. Carter-Mann never saw any evidence of others living in the home.

Carter-Mann acknowledged that on May 14, 2011, she wrote the following report regarding her last visit with the Nelsons after the victim's death:

> Assessment worker, Zandra Carter-Mann, went to the home to check on the family after [the] loss of their daughter, [E.N.]. Mr. Nelson stated

that he was doing well and Tina was still in bed. AW Carter-Mann asked him what happened.

He reported [that] they had noticed for a couple of days the baby wasn't feeling good and had taken her to the doctor as they told me they would. Mr. Nelson stated that he was holding the baby when she began to spit up through her mouth and nose. He said he took the suction and cleaned her mouth and nose. He said he began to notice that she started changing colors.

Mr. Greg said Ms. Tina was putting . . . [their older daughter] on the bus, and he went to the door and told her to bring the cell phone so he could call the ambulance. Mr. Greg said he did CPR on the baby until the ambulance arrived, and once there, they started CPR. Mr. Greg said once they got to the hospital [E.N.] was pronounced dead.

Mr. Greg said he really didn't know what to do about funeral arrangements but donations were being taken up in the community. Mr. Greg said Enon, a church on Edith-Nankipoo, had paid for her a plot in full. Mr. Greg said [their older daughter] would be with his dad until they were feeling better.

Ms. Tina eventually came out and told worker a story that was consistent with Mr. Greg. AW Carter-Mann thanked the family for talking to her and told them to call if they needed anything.

Carter-Mann stated she knew that the Nelsons, including their older daughter and the victim, were supported by Tina Nelson's disability check of $627 a month and that the Nelsons did not own a car and did not have drivers' licenses. During her home visits, the Nelsons had adequate food for themselves and their children. She said that Gregory Nelson had a brother, Timothy, and that Gregory and Timothy had made allegations through DCS against each other regarding the safety of Tina and Gregory Nelsons' children. Carter-Mann said that although Timothy was staying with the Nelsons for a period of time, he left before the victim came home from the hospital. She noted an incident when Gregory Nelson became verbally aggressive with a school employee regarding a problem involving his older daughter and later called back and apologized. While she acknowledged that Gregory often became verbally aggressive with the DCS workers, she said there was never a time when he became physically aggressive with anyone from DCS. She also stated that Tina Nelson had never been physically aggressive with anyone from DCS.

Carter-Mann stated that it was her opinion that the Nelsons were able to take care of the victim's needs. She said the Nelsons received training from the hospital about administering CPR and caring for premature infants. She said it was not part of her job responsibilities to review the training the Nelsons received at the hospital.

She said that the Nelsons never told her they had trouble determining when the victim's next feeding needed to occur. Although she never saw the Nelsons feeding the victim because the victim was always asleep, Gregory Nelson talked to her about putting cereal in the victim's bottle. She told Mr. Nelson that the baby was not old enough for cereal but interpreted his comment to mean that the victim was eating rather than not eating. Carter-Mann said that her last home visit with the Nelsons before the victim's death was on May 3, 2011, or May 4, 2011. She also visited them after the victim's death on May 14, 2011. She stated that the Nelsons appeared to be bonding with the victim during her visits.

Carter-Mann admitted that she may have only made four or five home visits with the Nelsons prior to the victim's death because she tried to visit them every two weeks. She said that DCS had never discussed Tina Nelson's intellectual delays and was not aware of her intelligence quotient (IQ). Carter-Mann completed a closing safety assessment on May 27, 2011, wherein she stated that she had no safety concerns regarding the Nelsons' older daughter following the death of the victim. Carter-Mann said she had personally observed Tina Nelson caring for her children and had never believed it was appropriate to remove the children.

Carter-Mann drafted her closing safety assessment before receiving the results from the victim's autopsy. Once she received the autopsy report, DCS reopened the case, and the Nelsons' older daughter was removed from their home in August 2011. Carter-Mann stated that DCS did not conduct psychological evaluations of the Nelsons because she did not find they had any mental impairment that would warrant a psychological evaluation. When she told Gregory Nelson that he needed to find a job because he was physically able to work, he became angry and told her that DCS could not make him work, and Tina Nelson supported Gregory Nelson's desire not to work. She said that there were several times when Gregory became verbally aggressive with her over issues related to the victim, and Tina always sided with her husband. She said that Tina Nelson never disagreed with Gregory Nelson during the four or five years that she knew them.

Kim Coffee, an employee at the Lauderdale County Juvenile Court and the chairman of the truancy board, testified that she saw the victim prior to her death on May 11, 2011. She said that on April 20, 2011, the Nelson's older daughter had a truancy case before the board. After this case was heard, she learned that the Nelsons and their children had been standing outside in fifty-degree weather for two or three hours while

they were waiting on a ride home. Coffee said that she became very upset with the Nelsons because the victim was dressed only in "very lightweight clothing and a very lightweight blanket" at the time. Coffee stated that she was present when Dawn Hemby, an investigator with the juvenile court, observed a red spot on the victim's right eye. When the Nelsons were asked about the victim's eye, they replied that the victim was "fine" and that they had already "had it checked on." Coffee said that when she gave the Nelsons a ride home that day, she was concerned because the victim "just stared into space" and "showed no emotion." She said the victim "didn't smile, she didn't laugh, she [had] no emotion whatsoever." She contacted DCS about her concerns regarding the children.

Approximately two weeks after April 20, 2011, Coffee said she received a call from a person she knew, who asked to remain anonymous, stating that the Nelsons were beating their older daughter. She and Dawn Hemby went to the Nelsons' home for a welfare check. The Nelsons, who were outside their home, stated that they had not beaten their older daughter and that she was currently at Gregory's father and stepmother's home. When they located the Nelsons' daughter, they did not observe evidence of any injuries. Coffee stated that she never saw the victim when she spoke to the Nelsons outside that day.

Coffee stated that after the dependency and neglect case had been filed regarding the Nelsons' older daughter, she went to the Nelsons' home to pick them up for a pre-trial conference with their court-appointed attorneys. Although Tina Nelson knew Coffee was giving them a ride, Gregory Nelson was not aware of it, and he was "hollering and screaming" about having to leave even after she told him he did not have to attend. Gregory eventually got into her car although he continued to yell and act "out of control almost." She said that he was "just fussing, saying he had never harmed that child, and he accused his brother of being the one to report it." Although Coffee had interacted with Gregory Nelson in the past, this incident was the angriest she had ever seen him. Coffee conceded that Gregory had never been physically abusive to her. She stated that Tina Nelson was upset because she thought that Gregory Nelson's anger was directed as much toward her as it was toward Coffee because she had asked Coffee to give them a ride.

Dawn Hemby, a youth services officer with the Lauderdale County Juvenile Court, testified that she had known Gregory Nelson through his own juvenile proceedings and had gotten to know Tina Nelson when the Nelsons' older daughter had a case before the truancy board on April 20, 2011. Hemby stated that she voiced her concerns about the victim to Lotoya Ward, an employee of DCS who was also on the truancy board. Ward informed her that DCS had already opened a case on the Nelsons' children. Hemby said that approximately two or three hours later, someone in the juvenile court office notified her that the Nelsons had been standing outside in low fifty-degree weather

with the victim and their older daughter, and she and Coffee asked them to come inside the building. Hemby said that Coffee asked them why they were standing outside, and Gregory Nelson told them that they were afraid they would miss their ride. Coffee agreed to give them a ride home, and Hemby asked to hold the victim. As she was holding her, she noticed that the victim had "a blood spot" on the white part of her right eye. When she asked Tina Nelson what was wrong with the victim's eye, Tina said, "[T]he doctor said it's nothing." Hemby told her she needed to get a second opinion because it was not normal for an infant to have a blood spot on her eye. She said the victim was "[a]lmost lifeless" when she was holding her because the victim was not crying, cooing, or smiling. Hemby said she and Coffee took the Nelsons back home, and when she returned to the courthouse, she contacted Zandra Carter-Mann about the blood spot on the victim's eye.

Hemby stated that she believed that Tina Nelson was "bullied by" Gregory Nelson. She said Tina Nelson appeared capable of taking care of her own affairs because she had recently asked her if there was a court order preventing her from visiting her older daughter, who had been placed with her grandparents. She stated that the last two or three times she had seen Tina, Gregory Nelson had not been with her. Hemby believed that Tina was capable of taking care of herself and her children:

> I think [Tina Nelson] . . . may be just a little slow, but not non[-] functioning. I think she's capable—I don't know if she would be capable of . . . being able to take care of financial things. And I don't really know why I think that, but that's just the impression that I get of her, that Greg pretty much does that. But as far as her cooking or cleaning and taking care of the kids, yeah, I think she could [do that].

Hemby stated that when she went to Irene Nelson's to check on whether Tina and Gregory's older daughter had been physically abused, she carefully examined the child and determined that the anonymous call had been unfounded. In fact, the child told her that her father had not hit her and that her Uncle Timothy, Gregory's brother, was "just trying to start stuff." Hemby said the anonymous call to Coffee was the only time she had ever received a referral about Tina and Gregory Nelson abusing one of their children.

Teresa Simmons, a customer service representative in charge of medical records with MedSouth Medical Center, testified that Dr. Randy Isaacs, a pediatrician in that medical group, treated the victim four times on March 9, 2011, March 16, 2011, March 30, 2011, and April 13, 2011. On March 9, 2011, Dr. Isaacs saw the victim as a new patient for her two-week physical. On March 16, 2011, Dr. Isaacs conducted a weight check on the victim and determined that the victim needed a hearing test. He noted that the victim appeared to be "[w]ell developed, well nourished, well hydrated." Dr. Isaacs

noted that the victim had low body heat and weighed three pounds, four ounces when she was born. On March 30, 2011, Dr. Isaacs checked the victim's weight and discussed the victim's fussiness, spitting up, and the use of gas drops. On April 13, 2011, Dr. Isaacs noted that the victim was wheezing, frequently spitting up, and fussy in the afternoon and that he believed the victim might have thrush.

The office records showed that the Nelsons called Dr. Isaacs's office on March 21, 2011, because the victim had been having gas. A nurse returned that call and suggested that they give the victim Mylicon drops and told them to return to the office if the problem worsened. The Nelsons also called the office on April 6, 2011, because the victim had been spitting up her formula. A nurse returned this call, but the Nelsons did not answer.

Bridget Worlds, the custodian of the records for the Lauderdale County Health Department, testified that the records from March 10, 2011, noted that the victim's parents had "disabled mental capabilities, but seem[ed] to understand infant care and formula prep." On April 7, 2011, Gregory Nelson told a social worker at the health department that he believed something was wrong with his daughter because she was breathing strangely and spit up often. He believed that the victim's formula did not agree with her. The social worker encouraged Gregory Nelson to take the victim to the doctor if he believed she was not well. On April 28, 2011, Tina Nelson told a social worker that they were supposed to take the victim to the doctor on April 27, 2011, but that it was raining and too cold to take her out, so she planned to reschedule the appointment. Tina said the victim still spit up some and that when she took the victim to Dr. Isaacs's office the previous week, he prescribed medicine for the victim's ear infection. Tina and Gregory Nelson said that they were concerned about the victim's stools and were giving her some apple juice that helped this problem. On May 4, 2011, approximately a week prior to the victim's death, the victim weighed 7.2 pounds and had no known allergies, fever, or illnesses. A nurse on that date determined that the victim's eyes were "normal" and that the parent-child interaction was "good." The nurse also determined that the victim's fontanels and musculoskeletal system were normal. The health department's records showed that social workers from the HUGS program conducted home visits with the Nelsons on March 24, 2011, April 7, 2011, and April 28, 2011.

Joe Pursell, a Lauderdale County juvenile investigator, testified that after he received the autopsy stating that the victim's cause of death was homicide, he interviewed Tina and Gregory Nelson on August 16, 2011. During this interview, he informed the Nelsons of the victim's head injuries and broken ribs and asked them how these injuries could have occurred. Pursell said that Gregory Nelson's attitude was "just nonchalant" and that Tina Nelson never showed any type of emotion. Although he had seen Gregory and Tina Nelson crying at the hospital the day of the victim's death, he

never saw them cry again. Pursell advised Gregory Nelson of his Miranda rights, which he seemed to understand, and Gregory wrote the following statement:

> Date of May 4-8, I seen [R.C.] push my wife, Tina Nelson, down with the baby—with the baby. Hit her head on the floor. I went to tell his mother, and all she did was laugh.
>
> On a couple times I left the baby around my brother, Tim Nelson, so me and my wife could have some time alone, and the baby starts crying. I asked him what was going on and going around . . . the baby. He said he's checking to see why she was crying so much.
>
> Ever since [R.C.] pushed my wife down with the baby she had been crying a lot. We took her to the doctor and they said they could not tell what was wrong except an earache.

Pursell said he had known Gregory Nelson since he was a juvenile and had "seen him act up between him and his brother and between him and his father." Gregory told Pursell that after Kim Coffee and Dawn Hembry noticed the red spot on the victim's eye on April 20, 2011, they made a doctor's appointment, but the victim died before her appointment.

Pursell also advised Tina Nelson of her Miranda rights, which she also appeared to understand, and then Tina wrote the following statement:

> When I delivered the baby in February 21, 2011, from the hospital in Jackson, Tennessee, I brought her home from the [hospital]. She started crying, so I'd feed her and take care of her.
>
> In April and May, I had to get [Timothy] Nelson[, Gregory's brother,] to watch her because I was doing clothes and I was putting them outside.
>
> And in the months that T[imothy] and Renee and her kids stayed with us, I told Tim[othy and R.C., Renee's son,] to stop throwing things at the baby and to anybody in the house. I didn't think that Tim[othy] would or would not do anything to the baby or [my older daughter].
>
> So about April or May I would stay up with the baby in my hands, and [R.C.] was running towards the house. He pushed me and the baby down. Didn't know it hurt the baby at all.

- 14 -

And there is one more thing. The kids would play outside, and one day [R.C.] and [D.C.][, Renee's daughter,] . . . pushed [my older daughter] down and start[ed] to laugh about it.

I went to the bathroom with [the baby] in my arms, and the bathroom door was not going open or closed. I think I bumped the baby's head with the doorknob. Did not think it was going to hurt the baby['s] head.

And when May 9 and 10 I had to go to Ripley hospital for an x-ray done on my back, I stopped at the dollar store to get baby [Pedialyte] for not eating at all.

Pursell located Gregory's brother, Timothy Nelson, and Timothy's girlfriend, Renee, in Dyer County. Timothy and Renee told him they, along with Renee's daughter and son, had lived with the Nelsons until April 10, 2011. He stated that Tim Nelson, Gregory and Timothy's father, later told him that he had picked up Timothy on the side of the road on April 10, 2011.

Pursell said that when he interviewed Tina Nelson, he had to ask her if she could explain the victim's injuries two or three times before she gave her written statement. He later interviewed R.C., Renee's son, who said he knew nothing about an incident where he pushed or knocked Tina Nelson down while she was holding the victim. Pursell said he did not know Tina Nelson's IQ but believed she was "below average."

Jeremy Booker testified that he was incarcerated at the Lauderdale County Jail at the same time as Gregory Nelson. After completing his work in the jail's kitchen, he overheard a conversation that Gregory Nelson was having with a man in a dark suit:

One day we had went back into housing. My coworker that was back there that was with me had to leave back up to the kitchen, so I stayed back there in housing and just stood back against the wall. Greg was sitting over in the library with an older gentleman wearing either a dark blue or black suit. I never saw his face because he was looking down at the paperwork.

But the door was standing about an inch and a half to two inches wide opened, and I overheard [Greg state] that it was around 2:00 to 2:30 in the morning, the baby was crying, we wanted to go back to sleep, he hit her in the side, slapped her around, and kicked her in the head.

- 15 -

Booker stated that the man with Gregory Nelson that day "was an older gentleman in a dark blue or black suit, balding on top, grey hair, but he was looking down at some paperwork, and I did not see [his] face." He said that although he initially thought that the man in the suit was an attorney, he was not certain of that. After he heard Gregory Nelson make this statement, it disturbed Booker so much that he moved away from that area. He never heard the man in the suit speak or ask a question and never heard the rest of the conversation. Booker said that he may have been listening at the door for two or three minutes.

When Tina Nelson's attorney asked Booker if he was the man talking to Gregory Nelson the day of the statement, Booker stated, "It's very possible [that you were talking to Gregory Nelson that day]. All I know is it was an . . . older gentleman wearing a dark blue or black suit, balding on top, and had grey hair." Booker stated that he was unable to pin the date down enough to check the visitor logs in the jail. Booker denied that he had received anything in exchange for making this statement and denied that he was hoping to receive a benefit for providing this statement to the State.

Booker stated that he had children of his own and had to move away after he heard Gregory Nelson's statement because he was "just so infuriated or . . . mad over what I had heard that . . . I feared that if I had not moved off to another position that I may have actually just caught another assault charge." As soon as he got back to the kitchen, Booker told Pat Coffee, who was Kim Coffee's mother and an employee in the jail's kitchen, about Gregory Nelson's statement.

Booker initially said that he overheard Gregory Nelson make this admission in January 2012, and a juvenile investigator came to see him a couple of days later and took his statement about what he had heard. However, after reading the first line of his statement, which was dated January 11, 2012, and which indicated that Booker had overheard Gregory's admission two-and-a-half months before giving his written statement, Booker acknowledged that he heard Gregory's admission around the end of October or the beginning of November 2011 rather than January 2012. Booker stated that someone came to talk to him shortly after hearing Gregory's admission and then Joe Pursell took his written statement two and a half months later. Booker said there was no question in his mind that he heard Gregory Nelson admit that he hit, slapped, and kicked the victim.

Richard McFall testified that in October 2011 he met with Gregory Nelson in jail. At the time, he was representing a woman charged with aggravated assault in Lauderdale County and wanted to talk to Gregory Nelson about a lead he had that Gregory's brother, Jason Nelson, might have been involved in his client's case. McFall stated that he met with Gregory Nelson in the library and that his interview lasted no longer than five

- 16 -

minutes. During that time, he did not notice anyone standing outside the library door. McFall stated that he never talked to Gregory about why he was incarcerated. Instead, he informed him that he did not want to talk to him about his case and only had some questions about his brother, Jason Nelson. McFall stated that during their meeting, Gregory Nelson never stated that he hit, slapped, or kicked the victim. He asserted that he would have remembered if Gregory had told him any of these things. McFall stated that he could not remember if he had signed a sign-in sheet before talking to Gregory Nelson that day. He admitted that in October 2011, he was not grey-headed or balding.

Gregory Nelson, the Defendant-Appellant, testified that a short woman attorney in her late forties from his attorney's firm visited him while he was incarcerated at the Lauderdale County Jail. He also stated that while he was incarcerated he met with attorney Richard McFall to talk about a case involving his brother. He said that during his meeting with McFall he did not state that he hit or slapped the victim because he "wouldn't never do nothing [like that]." Gregory Nelson said that he did not meet with any grey-haired, balding men to discuss his case while he was in jail.

When asked about the written statement he gave to Joe Pursell, Gregory said that sometime during the period of May 4 through May 8, he saw R.C., his brother's girlfriend's son, push down Tina Nelson, who was holding the victim, which caused the victim to hit her head on the side of the door in the living room of their trailer. He did not remember the exact date that this incident occurred and was unsure whether R.C. intentionally or accidentally knocked them down. Gregory did not believe that Tina took the victim to the doctor after this incident. He said that he always made the doctor's appointments and set up the transportation and that Tina accompanied the victim to the doctor.

Gregory stated that his brother, Timothy Nelson, Timothy's girlfriend, and the girlfriend's two children stayed with him them periodically. He said that he kicked his brother Timothy out of his house on May 1, 2011, and that Timothy returned to his house on May 4, 2011. When Timothy returned, it "[d]idn't work out" because Timothy ate all of their food and a representative from DCS saw that they did not have any food in their refrigerator. Gregory Nelson also said there was an incident that he mentioned in his statement when he left the victim around his brother, Timothy Nelson, while he and his wife were in their room, and the victim began crying. When he walked to the front of the trailer, he saw Timothy "leaning over the baby bed." He said it concerned him because he "never hardly ever let people get close to [his] baby." As he approached, Timothy told him to "get [his] damn kid."

The day of the victim's death, Gregory stated that he was feeding the victim when "all of a sudden" she started spitting up. As he suctioned formula out of the victim's

mouth and nose, the victim turned very pale, and her lips turned blue. At the time, Tina Nelson was outside the trailer putting their older daughter on the bus. Because Tina had the cell phone, he had to call her back inside to call 9-1-1. Gregory said that he wiped the victim's mouth with a towel and called 9-1-1, asking them to hurry because the victim had stopped breathing. He claimed he called 9-1-1 four different times. With assistance from the 9-1-1 dispatcher, Gregory performed CPR on the victim on top of the mattress in the living room before the ambulance arrived, although the victim never recovered. Gregory said the ambulance arrived at his home approximately an hour after his 9-1-1 call, and he believed the victim died because it took the ambulance too long to arrive. He acknowledged that he was upset when the EMTs finally arrived at his house. As soon as the ambulance arrived, Tina Nelson gave the victim to the EMT.

Gregory stated that the night before the victim died, the victim had been sleeping with him and Tina on the mattress in the living room because it was cold in their house. When they woke up in the morning with their older daughter, they placed the victim in her crib. Tina helped their older daughter get ready for school, prepared a bottle for the victim, and began feeding the victim before giving the victim to Gregory and walking outside to put their older daughter on the bus.

When asked if he ever pushed the victim out of anger or to make her quiet, Gregory said, "No sir. That's my kid. No, I wouldn't." He admitted that he had a temper. However, he asserted that he had never yelled at the victim and had never neglected to feed her. He denied striking the victim, kicking the victim in the head, or punching the victim in the ribs.

Gregory said that Tina did not have trouble telling time but admitted that she had trouble with organization. He stated that he had done farming and masonry jobs in the past and had gone to school through half of the twelfth grade, although he did not graduate. While in school, he attended some special education classes. He stated that he had a tumultuous relationship with his family and particularly with his brother, Timothy Nelson. He said he had called the sheriff to remove Timothy from his home because he ate all the family's food, destroyed their property, and did not clean up after himself. He stated that Timothy was very intellectually disabled and that Timothy had falsely accused him of beating his older daughter.

Gregory stated that he had never seen Tina treat the victim in an unkind manner and did not believe that Tina would have ever hurt the victim. He said there was an incident when he "got on to" Tina about bumping the victim's head on a doorknob, although it did not appear that the victim was injured. Gregory said that he "trusted" Tina with the victim. He stated that there was never a time when he was alone with the victim. Gregory stated that his stepmother, Irene Nelson, took care of the victim one time

outside their house. In addition, he and his mother, Peggy Grimes, occasionally took the victim out of their house together.

Gregory admitted that he had hurt two people in the past but not so severely that they had to go to the hospital. He also admitted that he had slapped Tina one time when she was yelling at their older daughter. He said he had caught Tina Nelson in lies many times. Gregory claimed that he knew the victim had not been okay "for a while" and that he had told Tina to take the victim to the doctor. He said the victim had been having trouble breathing ever since she got home from the hospital and that he called DCS to let them know that something was wrong with the victim. He said the victim sometimes did not have a good appetite. Although he admitted that he made the doctor's appointments, he did not know whether Tina actually took the victim to the doctor because he did not go to the doctor with her and did not call the doctor to confirm that the victim had been seen. He reiterated that he had never been alone with the victim.

Although he acknowledged that he and Tina did not visit the victim in the hospital often between February 23, 2011 and March 4, 2011, he said this was because they did not have money for transportation. His stepmother, Irene Nelson, brought him to the hospital one time to see the victim, although he could not confirm the date that this occurred. He did not recall a DCS team meeting in which Zandra Carter-Mann told him and Tina that they would have to return to the hospital to bond with the victim or the victim would not be permitted to go home with them. Although he admitted telling the hospital staff that he could not keep coming to the hospital because he had family problems, he denied that the victim was an inconvenience to him.

Gregory stated that Bill Freeman, the ambulance driver who became emotional during his testimony about the victim's death, was lying when he testified that he and Tina Nelson did not follow him to the ambulance when they were performing CPR on the victim. He claimed that he went to the ambulance door and asked to see the victim. Gregory denied that he was laughing and smoking outside after the ambulance arrived and asserted that the victim died in his arms.

Gregory said that on April 20, 2011, he attended a truancy board hearing for his older daughter. While they were waiting on their ride, he told Tina to bring the victim inside, and she did. Gregory was unable to explain the red spot on the victim's eye that Kim Coffee and Dawn Hemby observed on that date. Although he asserted that Tina took the victim to the doctor to check on the victim's eye after April 20, 2011, he could not explain why the last time the victim had been seen by her pediatrician was on April 13, 2011. He acknowledged that a medical professional did not see the victim until a nurse at the health department saw the victim on May 4, 2011, which was at least two weeks after the red spot had been observed on the victim's eye. He also acknowledged

that Zandra Carter-Mann never observed the red spot on the victim's eye because the victim was always asleep every time she visited their home.

Gregory stated that he could not explain why the victim had bleeding on her brain. He admitted that the victim had old bleeding and new bleeding that had occurred just prior to her death. He also could not explain why the victim had six fractured ribs on her left lateral side, eight fractured ribs on the left posterior side, and five fractured ribs on her right lateral side that were in the process of healing. Although Gregory believed that his CPR could have caused the fractures, he was unable to explain how the victim had sustained both old and new fractures. He also could not explain how the victim sustained the hemorrhage in her eye. Gregory Nelson admitted that either he gave the victim these injuries or Tina gave the victim these injuries because they were the only people who took care of the victim. He insisted however that Booker's testimony that he hit, slapped, and kicked the victim was a lie.

Gregory stated that he had never seen Tina hurt the victim or their older daughter and that Tina loved her children. He also stated that he never struck the victim the night before she died. He stated that he was not better trained than the investigators and nurses who observed the victim up until her death and saw nothing wrong with her. He stated that the HUGS representative, who was at his house on April 28, 2011, never called the ambulance because of the red spot on the victim's eye. Gregory asserted that he never ignored anything he thought was important about the victim's health. He confirmed that he never performed CPR on the victim any time before the day the victim died. He said that Tina had never said anything about administering CPR on the victim at any time prior to the day she died.

Irene Nelson, Gregory Nelson's stepmother, testified that Gregory had called her at 6:55 a.m. on May 11, 2011, and told her that the victim passed away. She called her husband, Gregory's father, and they arrived at Gregory and Tina's home forty-five minutes to an hour later. Irene stated that when they arrived, Gregory and Tina were not laughing and joking. She said that Tina immediately ran to her, hugged her, and cried and that Gregory hugged his father and cried.

Irene remembered picking up Gregory's brother Timothy and Timothy's girlfriend as they were walking away from Gregory's house in early April 2011. After that point, she never heard of Timothy and his girlfriend living with Gregory and Tina. She acknowledged that it took her and her husband a while to get to Gregory and Tina's house on May 11, 2011, and could only testify about what she observed when they arrived at the house. She was not present when Gregory became aggressive with the EMT and had to be restrained by a deputy.

Irene stated that the only time she took care of the victim was on Easter Sunday, April 24, 2011, when she took the victim and the Nelson's older daughter to Gregory's grandmother's house. She said that they stayed with the family for three hours during the visit and that Tina and Gregory did not go with them. The victim slept almost the entire visit, and when she awakened the victim and fed her, the victim "started crying, continuously, nonstop" and would not stop crying "no matter what [she] did." Irene said that she tried patting the victim's back and rocking her, but nothing seemed to help. She agreed that the victim's behavior was a little unusual for an infant because she expected the victim to be happy, use the bathroom, and go back to sleep after eating. She did not believe that the victim drank much of her bottle before she began crying. By the time she returned to Tina and Gregory's house, the victim was still crying. She said it was very difficult to wake the victim that day. Irene said that other than when Tina took their older child to the bus, she did not know of any times when Gregory was alone with the victim. She was not aware of anyone else taking care of the victim.

Dr. Fred Steinberg, who had received a PhD in clinical psychology and had been working as a forensic psychologist for the last twenty years after completing additional coursework, testified as an expert in the field of forensic psychology. He stated that he had been qualified as an expert many times, was licensed to conduct evaluations in Tennessee, had consulted with attorneys in over 1000 cases, and had completed approximately 300 to 350 evaluations on individuals.

Dr. Steinberg stated that Tina Nelson's results from the Wechsler Adult Intelligence Scale test showed that she had an IQ of 53. He explained an average IQ is 100 and an IQ of 70 or below is in the "extremely low range," a range that has been historically called the "retarded range." Dr. Steinberg stated that only one percent of the population had an IQ of 70. He stated that Tina Nelson, with an IQ of 53, would have the intellect of a first or second grade child and "would have difficulty keeping up in situations that require thinking and reasoning abilities." He noted that individuals with a lower IQ were "highly suggestible[,]" which meant that an interviewer who asked closed questions could be "telegraphing [to the interviewee] the kind of answer [the interviewer was] looking for."

Dr. Steinberg stated that when he reviewed Tina Nelson's written statement to Joe Pursell, he made an interesting observation:

[W]e have a body of psychological literature that suggests . . . that if you ask a question several different times to somebody who is highly suggestible, a child, a retarded individual, they will want to please you. You know, if you ask it a second time, there's a high frequency assumption

that you didn't give the right answer or else why are they asking it again, okay.

So we have a situation here where Mr. Pursell asked Ms. Nelson . . . the question several times. And I believe the question was, ["]How could that have happened [to the victim]?["]

Well, if you look at the statement, Tina went ahead and gave three different answers, which very well could have corresponded to each time the question was re-asked. This is a common phenomenon, and it's very possible that she was either unaware of what the cause and effect was in each circumstance that she answered, or she was just fishing for something that would be acceptable to the interviewer because the question was being asked again. I found that fascinating.

Dr. Steinberg stated that he found evidence that Tina Nelson had difficulty thinking and reasoning in both the intelligence test and the Rorschach test, which is a personality test using inkblots. He explained that Tina's impaired ability to reason and think could affect her ability to perceive cause and effect. He stated that the Rorschach test "yielded results that were typical of a psychotic type of disturbance, problems in thinking clearly and seeing things accurately." The test also showed that Tina had "severe impaired reality testing," which meant that she had a "different perception of the world around [her]" than most other people would. He said that individuals having impaired reality testing "just don't see things clearly, and to other people it looks like [they are] lying. But [they are] not. [They are] just not perceiving it correctly." Finally, the Rorschach test showed that Tina had "severe disruptions indicative of psychotic lapses in reasoning, thinking, and thought organization[,]" which was significant because Tina had been diagnosed with psychosis prior to this incident.

Dr. Steinberg gave Tina Nelson the Wisconsin Card Sort Test, which is a nonverbal test that "measures planning, carrying out activities effectively, and self-regulation" as well as "reasoning ability and the ability to come up with a new solution when the old one isn't working." He stated that this test, consistent with the Wechsler Adult Intelligence Test, showed that Tina had "an inability to effectively plan and problem solve," which related to the ability to perceive cause and effect. He added, "If you can't plan and anticipate and reason, you're going to have a big deficit in being able to appreciate consequences." He stated that based on his testing and what he had learned from others, Tina Nelson would not be the one to make decisions in a relationship.

Tina Nelson's scores on the Wechsler Adult Intelligence Test showed that she was in less than the first percentile in nearly every subject, which meant that "99 percent of all

of the rest of us function[ed] at a level higher" than she did.  He stated that if someone described Tina as "a little slow," this would not be an accurate description because Tina was "in the very bottom of the mild mental retardation range, almost in the moderate mental retardation range, which is significantly low IQ."  However, he stated that individuals in the "mild mental retardation range" can follow specific directions when they are told what to do and "can be trained within reason, with supervision, to function." He stated that based on the testimony he heard, Tina could follow directions "when she's told what to do and it's set up for her[.]"  However, "[w]hen she's left to her own devices, she doesn't have the reasoning ability to make good choices."

Dr. Steinberg also "agreed with the previous diagnosis [Tina] was given of major depression, recurrent, with psychotic features" and "mild mental retardation."  He explained that Tina Nelson had some serious psychiatric issues:

> She has been prone to episodic psychotic kinds of thinking.  She's had some auditory hallucinations on occasion.  And, you know, when you add this kind of inability to stick to reality on occasion, to an individual who is compromised intellectually, you've got more multiple problems, because on top of it you have a profound mood disorder, which is further affecting her functioning.  So this is a young lady that has significant psychiatric problems.

Nevertheless, Dr. Steinberg determined that Tina was competent to stand trial.  He explained what was involved in making a competency determination:

> [T]he competency determination is based upon several things, understanding how the court works, and if you're not understanding it, being able to retain it, being educated and retain[ing] it; working with your lawyer; having an understanding of the charges against you; and so on and so forth.
>
> I found [Tina Nelson] to be able to do that.  Sometimes she needed a little bit of, you know, education in certain areas.  But before I got into this field I didn't know fully how courts worked either, so I just don't think that's a big issue.  You can be educated, you can retain it for your own use, at least during the period while you're in litigation.

He stated that she "scored very well" on the test he used to determine whether she was competent to stand trial.  Dr. Steinberg stated that he believed Tina Nelson understood the difference between right and wrong.  He acknowledged that knowing the difference between right and wrong was a part of his competency evaluation because if the person is

charged with violating a law, he or she has to know what is wrong about his or her behavior.

Dr. Steinberg said he evaluated Tina for malingering, which is "faking a psychiatric diagnosis." Although Dr. Steinberg found that Tina "did a little bit of embellishment" during her examination, it did not "negate the fact that there were psychotic indications there[,]" especially given that she had a history of psychotic symptoms for which she had been medicated prior to this incident. He asserted that Tina Nelson's psychosis and her low IQ existed well before the victim's death. He stated that because Tina was suggestible, there was a probability that her husband could have told her what to say or do, although he had no data showing that that is what occurred in this case. He noted that Tina "show[ed] an inability to do what you and I would do, like take a baby to a doctor because there was a bump on the [baby's] head, or, [because she] was knocked over, or whatever." He said that Tina could have provided three different possibilities for the victim's injuries to Pursell either because she thought one of these three incidents could have caused the victim's injuries or because she was fabricating a story to make Pursell stop questioning her. However, Dr. Steinberg said that because other people gave similar reports regarding these incidents involving the victim, these incidents likely occurred.

Dr. Steinberg noted that Tina Nelson had "auditory hallucinations[,]" or was hearing voices, when her grandmother died and when the victim died. He added that it was not uncommon for an individual to hear voices when the person has "major depression to a psychotic proportion." He stated that Tina had been prescribed antidepressants for her major depression and that this medication could have helped with her depression if the medication had been properly adjusted and if she properly took the medication. However, he stated that someone like Tina who was "not organized and can't run [her] own life" would have more trouble regularly taking her antidepressants.

Dr. Steinberg evaluated Tina Nelson on November 30, 2011, December 1, 2011, and December 29, 2011. During these evaluations, he had access to her mental health records, which showed that she had a history of major depression for which she received treatment in 2002. During these evaluations, Tina disclosed that she had mood swings with which her husband was unable to cope. Although Dr. Steinberg stated that it was possible that Tina had a bipolar disorder because she had periods when she was agitated and periods when she was depressed, he stated that there needed to be more observation before Tina could be diagnosed with bipolar disorder. When asked if hearing a baby cry while being in an agitated state might be like nails on a chalkboard to someone like Tina, Dr. Steinberg stated, "I can't say that, because that's a specific instance[,] and I didn't assess that."

Dr. Steinberg also stated that Tina Nelson had been hitting herself in the head and that she had "a history of self-injurious behavior." In 2001, Tina attempted to cut her wrists after her grandmother died. Although Tina denied hurting the victim, she described periods of upward aggression to individuals other than the victim. He said that "apparently [Tina] came from a very abusive kind of situation as a child" and she told him that "she chased somebody with a butcher knife in reaction to her grandmother's death." He stated that she was "psychotic at the time" and required "antipsychotic medication." She also told him that she was taking hydrocodone, although she denied abusing that drug. Dr. Steinberg stated, as in all cases like this, the reliability of Tina's self-reporting was considered questionable because individuals do not "want to get the full punishment, if punishment at all" for what they have done.

Dr. Steinberg also noted that Tina had limited psychological resources for adequate coping, which meant that she was emotionally reactive to her environment. When asked if Tina could be emotionally reactive to a baby crying, Dr. Steinberg stated:

> Could be anything. You can't say this is happening at a given time. That's why I say, you know, I'm not in a position to assess how she was at the given time of the alleged incident.
>
> But what I can say is that she shows these personality characteristics, and . . . the jury will make a decision as to whether it's relevant or not within the context of everybody else's testimony.

He added that individuals like Tina with "low intellectual functioning will function better in a very structured environment, when they know exactly what's expected of them." However, "if they're in a chaotic situation or in a situation in which they just can't get it, they can't figure it out, they can't reason, they can't do all the things that I said they can't do, then they may be prone to be over-reactive, hyper-reactive, and be rather emotionally reactive." He also noted that Tina had difficulty in situations in which she feels she is not in control. He emphasized that intellectually disabled individuals like Tina needed "structured environments" and "can do very fine under those circumstances." However, if they are in a dysfunctional environment, then everyone will suffer.

Tina Nelson, the Defendant-Appellant, testified that she had two daughters, B.N., who was eight years old, and E.N., the victim, who passed away on May 11, 2011. Tina stated that she stayed in the hospital for three days before being discharged and that the victim stayed in the hospital for two weeks before coming home with them. She said she was unable to visit the victim frequently at the hospital because she had "transportation problems." However, at some point during these two weeks she returned to the hospital

to learn how to change diapers, feed and take care of the victim, give her a bath, and administer CPR.

Tina said the victim weighed three pounds, four ounces when she was born. When they brought the victim home on March 7, 2011, she, her husband, and her older daughter were the only people living in the home. She stated that her husband's brother, mother, and stepfather as well as her husband's father and stepmother visited them. When Gregory's brother visited them, he also brought his girlfriend, Renee Couples, and Renee's two children, D.C., who was thirteen years old, and R.C., who was twelve years old.

Tina stated that she and her husband fed the victim when she came home. When the victim awoke, she would feed her, clothe her, give her a bath, change her diapers, and put her to sleep when it was time for her to have a nap. She said the victim ate every two to three hours and when she would cry, she would rock her to sleep, feed her, change her diaper, or see what was wrong with her. When the victim was born, the doctors told her that the victim was healthy, although she had a low birth weight and had trouble retaining her body heat. Once they brought the victim home, she bought some Pedialyte at the doctor's suggestion because she noticed that the victim was not eating properly.

Tina Nelson denied seeing any bruises on the victim and denied seeing anyone hurting the victim. She denied hurting the victim herself, stating, "I would have hurt my own self before I hurt the baby." When asked what she would have done if she had seen her husband hurting the victim, she said, "I would be upset, but I know my husband did not do nothing to the baby at all."

Tina remembered telling Joe Pursell that R.C. had knocked her down while she was holding the victim. She said, "I don't know if it hurt the baby, the top [of] the head and the ribs." Although the victim cried when they were knocked down, she did not see anything wrong with her. When this incident occurred, she fell backward, and the victim landed on the floor with her arm underneath her. They did not take the victim to the emergency room after this incident because she did not have transportation. She admitted that she did not call Zandra Carter-Mann, the DCS case worker, about this incident and did not call the HUGS representative because she had lost her number. Tina claimed that she called Dr. Isaacs's office about the fall but could not explain why his office did not have a record of her call. She also said she reported the fall when she took the victim to see Dr. Isaacs about her problems with gas and the formula on April 13, 2011. Tina also claimed she spoke to someone in Dr. Isaacs's office after Kim Coffee and Dawn Hemby saw the red spot on the victim's eye, although Dr. Isaacs's office did not have a record of that phone call. Tina said that Dr. Isaacs's office told her to come in, and she told them that she was unable to get there because she did not have transportation. She said she

eventually got an appointment with Dr. Isaacs on May 9 or 10, but she missed this appointment because she had transportation problems. Although she rescheduled the appointment for a later date, the victim passed away prior to the appointment. She could not explain why her pediatrician's office had no record of the appointment on May 9 or 10. She asserted that she, not Gregory, called Dr. Isaacs's office to set up this appointment.

Tina also stated that she bumped the victim's head on a doorknob but that it did not leave a mark. After that incident, she checked the soft spot on the victim's head and determined that there were no bruises or marks. She loved both of her daughters and was very sad when the victim died. She "almost blacked out" and would have fallen to the ground if the EMT had not caught her when they told her the victim had died. She denied laughing with Gregory or with Gregory's father and stepmother and asserted that no one was laughing when the victim passed away.

Although she said she never saw Gregory's brother, Timothy, hurt the victim, she recalled an incident when Timothy picked up the victim when she was crying, and when she asked him what was wrong with the baby, Timothy told her and Gregory to get the victim because he was getting tired of hearing her cry. Gregory later asked Timothy to move out because he was eating all of their food.

Tina stated that she did not know why the victim passed away. She acknowledged that she and Gregory were the only people that took care of the victim other than the one time that Gregory's stepmother, Irene Nelson, took the victim on Easter Sunday. Although other family members helped with the victim, she and Gregory were always present. Tina acknowledged that Irene told her the victim would not stop crying after she gave her a bottle and that it was not normal for a child to cry after eating. Irene also told her that the victim's bowel movement was strong, and she informed Dr. Isaacs's office of this issue. She said that Irene had told her to take the victim to the doctor, but she was unable to get there because she had problems finding transportation.

Tina acknowledged that she only went to see the victim in the hospital after the staff informed her that they would not allow the victim to come home with her unless she visited her. However, she said she did not visit because she had transportation problems. Tina said she regularly called the hospital to check on the victim but admitted that she could have seen the victim two different times, even with the three-day advance notice required for transportation, before she finally visited the victim at the hospital on March 4, 2011.

After the victim's heart rate fell, Tina and Gregory told the hospital staff that they could not keep coming to the hospital because no one was taking care of their older

daughter. She and Gregory both went home because she could not control Timothy, who was there with Gregory's mother. She claimed she was unable to stay at the hospital by herself because she had "heart problems and stuff like that, and [Gregory] always stayed with me and watch[ed] after me too."

Tina admitted that she had told someone at the health department that she had an appointment for the victim in May but that it was raining, and they did not go. She explained that she and Gregory waited outside in the cold on April 20, 2011, after the truancy hearing because they were waiting for a ride that did not appear. She said she did not bring her daughters inside to wait because Gregory always watched after her and the children.

Tina acknowledged that the victim was a fussy baby and "was constantly crying" even if she tried to rock her to sleep. She did not know how the victim's ribs had been fractured on both sides and on the back. Tina acknowledged that fractured ribs would make a baby hurt and cry but asserted that she did not know how these injuries occurred. She also agreed that the bleeding on the victim's eyes and brain would make her hurt but claimed that none of the doctors she saw told her anything was wrong with the victim.

Tina admitted that the victim was fine when she left the hospital and that her problems started once they got her home and she kept crying. She acknowledged that the victim had trouble breathing for a couple of days prior to her death. She also acknowledged that the victim slept much of the time and that her appetite was "fair" but "[n]ot great."

Tina said that Sheriff Sanders's testimony that Tina had told him at the scene that she had woken up, fixed the victim a bottle, lain the victim on the mattress, and noticed that the victim was not breathing when she came back was "all a lie." She stated that the victim died in her husband's arms while she was putting her older daughter on the school bus. Tina said that the victim had been limp for thirty minutes or so before she handed her to the EMT and that she and Gregory were not doing CPR by the time the ambulance arrived. Tina claimed that she had gone outside at 6:15 a.m. to put her older daughter on the bus, and Gregory asked to use the phone to call 9-1-1 around fifteen minutes later. She told Gregory that she was going to wait until 6:30 or 6:45 a.m. to make sure their daughter did not miss the bus and that she was unable to check on the victim until after the bus picked up their daughter. Gregory said he had done CPR on the victim while Tina was getting their older daughter on the bus, and after Gregory yelled to her for help, she did CPR on the victim while Gregory repeatedly called 9-1-1. Tina said that the victim was alive when she left to put their daughter on the bus and that she was dead by the time she got back.

When the EMTs took the victim on May 11, 2011, Tina stayed with Gregory's father and stepmother. She said she did not go to the ambulance to check on the victim and did not ask to see her because they were doing CPR. She never asked to see the victim after Bill Freeman, the EMT, told her that the victim had died because she was "kind of upset at the time." She claimed she later saw the victim at the hospital. She stated that Freeman lied about her smoking and laughing while they were performing CPR on the victim.

Tina acknowledged that she did not cry when she gave her statement about the victim to Joe Pursell. She admitted that she often lied, and when she lied, she got in trouble and that Gregory had slapped her one time because she had lied. Tina admitted that she was depressed and that she had tried to slice her wrists when her grandmother passed away in 2001. She said she had never thought about hurting the victim.

Tina admitted telling Dr. Steinberg that she had mood swings and that Gregory did not handle them well. When she had her mood swings, she would get upset and would not want to be bothered with anything. When asked how she dealt with the victim's crying when she had her mood swings, Tina stated, "I can deal with the baby crying. It's no problem." She said that when the victim cried so much she could not take it, she would bathe her or feed her. She admitted that the victim cried a lot because she was hurting.

Tina said that, other than the day the victim passed away, there were no other times that she or Gregory tried to perform CPR on her. The night before the victim died, she and Gregory had laid the victim on the mattress. When the victim fell asleep at 9:00 p.m., she moved her to her crib. During the night, the victim awakened every two or three hours, and she and Gregory got up, fed her a bottle, and changed her diaper before rocking her to sleep and putting her back in her crib. She said the victim began crying as she was trying to awaken her older daughter for school. Tina asserted that Gregory never harmed the victim.

## ANALYSIS

**I. Motions for New Trial and Notices of Appeal.** Before addressing the sufficiency of the evidence issue, we must consider the effect of Tina Nelson's and Gregory Nelson's untimely motions for new trial and untimely notices of appeal. Following trial and sentencing, the trial court entered judgments of conviction against Tina and Gregory Nelson on December 13, 2013. On January 30, 2014, Tina Nelson filed a document entitled "Amended Motion for New Trial," even though she had not yet filed an initial motion for new trial. On February 19, 2014, Gregory Nelson filed a

"Motion for New Trial or in the Alternative for Directed Verdict." On February 28, 2014, Tina Nelson filed a document entitled "Motion for New Trial."[4] That same day, the trial court held a hearing on these motions and entered separate orders for Tina and Gregory Nelson stating that it lacked jurisdiction to rule on their untimely filed motions for new trial but that the appellate court could, in the interest of justice, review the sufficiency of the evidence issue raised by both parties. On March 13, 2014, Tina Nelson filed her notice of appeal, and on March 17, 2014, Gregory Nelson filed his notice of appeal. On April 11, 2014, the trial court entered corrected judgment forms, apparently pursuant to Tennessee Criminal Procedure Rule 36.1, showing that Tina Nelson and Gregory Nelson were sentenced as Range I, violent offenders with a release eligibility of one hundred percent for their aggravated child abuse convictions. See Tenn. R. Crim. P. 36.1 (adopted effective July 1, 2013) (allowing the correction of an illegal sentence at any time). The previously-entered judgment forms for these convictions had incorrectly shown that Tina Nelson was classified as a mitigated offender with a release eligibility of thirty percent and that Gregory Nelson was classified as a standard offender with a release eligibility of thirty percent.

"A motion for a new trial shall be in writing or, if made orally in open court, be reduced to writing, within thirty days of the date the order of sentence is entered." Tenn. R. Crim. P. 33(b). "[T]his thirty-day period is jurisdictional and cannot be expanded." State v. Hatcher, 310 S.W.3d 788, 800 (Tenn. 2010) (citing State v. Bough, 152 S.W.3d 453, 460 (Tenn. 2004); State v. Martin, 940 S.W.2d 567, 569 (Tenn. 1997); State v. Stephens, 264 S.W.3d 719, 728 (Tenn. Crim. App. 2007); Tenn. R. Crim. P. 45(b)(3)). Because Tina and Gregory Nelson failed to file their motions for new trial on or before January 13, 2014, the trial court no longer had jurisdiction of the case, and their motions were a nullity. See Tenn. R. Crim. P. 33(b); State v. Lowe-Kelley, 380 S.W.3d 30, 33-34 (Tenn. 2012). "A trial court cannot rule on the merits of a late-filed motion for new trial because the judgment has become final and the trial court no longer has jurisdiction over the case." Lowe-Kelley, 380 S.W.3d at 34 (citing Bough, 152 S.W.3d at 460; Hatcher, 310 S.W.3d at 799-800). An untimely motion for new trial waives all issues except for sufficiency of the evidence and sentencing. See Tenn. R. App. P. 3(e); Bough, 152 S.W.3d at 460; but cf. Tenn. R. App. P. 36(b) ("When necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal.").

In this case, the trial court entered corrected judgments forms for the aggravated child abuse convictions on April 11, 2014. It is well-established that an amended or

---

[4] The date listed on the Certificate of Service for Tina Nelson's "Motion for New Trial" is December 20, 2013; however, a line was drawn though this date and the date of February 28, 2014, the same date this motion was filed, was written above this date.

corrected judgment "operates upon the existing judgment" and "generally does not restart the time for filing a tolling motion such as a Rule 33 motion for a new trial or, as the case may be, a notice of appeal." State v. Raygan L. Presley, No. M2007-02487-CCA-R3-CD, 2008 WL 3843849, at *3 (Tenn. Crim. App. Aug. 18, 2008). Therefore, the court's filing of corrected judgment forms did not make the motions for new trial filed by Tina and Gregory Nelson timely.

Moreover, the amended judgments were entered when the trial court no longer had jurisdiction of the case, not only because the original judgments had become final prior to the late-filed motions for new trial but also because the corrected judgments were entered nearly a month after Tina and Gregory Nelson filed their notices of appeal. See State v. Green, 106 S.W.3d 646, 648 (Tenn. 2003) ("In a criminal case, when a notice of appeal is filed, the jurisdiction of the Court of Criminal Appeals attaches, and the trial court loses jurisdiction."); State v. Pendergrass, 937 S.W.2d 834, 837 (Tenn. 1996) ("The jurisdiction of the Court of Criminal Appeals attaches upon the filing of the notice of appeal and, therefore, the trial court loses jurisdiction."). Once a notice of appeal is filed, the jurisdiction becomes vested in the appellate court, and the trial court may not amend its judgment. Pendergrass, 937 S.W.2d at 837 (citing State v. Moore, 814 S.W.2d 381, 382 (Tenn. Crim. App. 1991)). Although the trial court no longer had jurisdiction of the case because the original judgments had become final and because the notices of appeal had been filed, the court, on April 11, 2014, apparently utilized Tennessee Rule of Criminal Procedure 36.1 to correct the illegal sentences in the initial judgment forms for the aggravated child abuse convictions, which showed an erroneous release eligibility percentage.

In addition, Tina and Gregory Nelson's untimely motions for new trial caused their notices of appeal to be untimely because they were filed more than thirty days from entry of the December 13, 2013 judgments. Tennessee Rule of Appellate Procedure 4 states that the notice of appeal shall be filed within thirty days of entry of the judgment appealed from or within thirty days from entry of an order denying a motion for new trial. See Tenn. R. App. P. 4(a), (c). Because the Nelsons' motions for new trial were a nullity, these motions did not toll the thirty-day time period for filing their notices of appeal, which caused their notices of appeal to be untimely. See State v. Davis, 748 S.W.2d 206, 207 (Tenn. Crim. App. 1987); State v. Robert Echols, No. W2013-02044-CCA-R3-CD, 2014 WL 6680669, at *11 (Tenn. Crim. App. Nov. 26, 2014).

Nevertheless, because the timely filing of a notice of appeal is not a precondition of this court having jurisdiction of the matter, we may waive the requirement of a timely notice of appeal filing "in the interest of justice." Tenn. R. App. P. 4(a). "'In determining whether waiver is appropriate, this court will consider the nature of the issues presented for review, the reasons for and the length of the delay in seeking relief, and any other

relevant factors presented in the particular case.'" State v. Rockwell, 280 S.W.3d 212, 214 (Tenn. Crim. App. 2007) (quoting State v. Markettus L. Broyld, No. M2005-00299-CCA-R3-CO, 2005 WL 3543415, at *1 (Tenn. Crim. App. Dec. 27, 2005)). "Waiver is not automatic and should only occur when 'the interest of justice' mandates waiver." Id. Moreover, "[i]f this court were to summarily grant a waiver whenever confronted with untimely notices, the thirty-day requirement of Tennessee Rule of Appellate Procedure 4(a) would be rendered a legal fiction." Id. (citing Michelle Pierre Hill v. State, No. 01C01-9506-CC-00175, 1996 WL 63950, at *1 (Tenn. Crim. App., at Nashville, Feb. 13, 1996)). Here, Tina and Gregory Nelson filed their notices of appeal approximately three months after entry of their judgments. They both raise only the issue of sufficiency of the evidence on appeal, and this court is not precluded from reviewing this issue. See Tenn. R. App. P. 3(e); Bough, 152 S.W.3d at 460. We note that Tina and Gregory Nelson have not specifically asked this court to waive the requirement of a timely notice of appeal and have not explained their untimely filings; however, given the seriousness of the convictions and the particular circumstances of this case, we conclude that the "interest of justice" is best served by granting a waiver. See Tenn. R. App. P. 4(a); see also Hatcher, 310 S.W.3d at 804; Crittenden v. State, 978 S.W.2d 929, 932 (Tenn. 1998).

**II. Sufficiency of the Evidence.** Tina and Gregory Nelson argue that because the evidence is insufficient to sustain their convictions for aggravated child abuse, the evidence is also insufficient to sustain their convictions for first degree felony murder in the perpetration of aggravated child abuse. We conclude the proof is sufficient to support Tina Nelson's and Gregory Nelson's convictions.

When considering the sufficiency of the evidence on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. State v. Davis, 354 S.W.3d 718, 729 (Tenn. 2011) (citing State v. Majors, 318 S.W.3d 850, 857 (Tenn. 2010)). When a defendant challenges the sufficiency of the evidence, the standard of review applied by this court is "whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). Similarly, Rule 13(e) of the Tennessee Rules of Appellate Procedure states, "Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the finding by the trier of fact of guilt beyond a reasonable doubt." "Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the criminal defendant bears the burden on appeal of showing that the evidence was legally insufficient to sustain a guilty verdict." State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009).

"In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence." State v. Dorantes, 331 S.W.3d 370, 379 (Tenn.

2011) (citing Duchac v. State, 505 S.W.2d 237, 241 (Tenn. 1973); Marable v. State, 313 S.W.2d 451, 456-58 (Tenn. 1958)). The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" Id. (quoting Hanson, 279 S.W.3d at 275). Consequently, so long as the evidence of the defendant's guilt is established beyond a reasonable doubt, the proof need not exclude every other reasonable hypothesis except that of the defendant's guilt. Id. at 380-81.

The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. State v. Campbell, 245 S.W.3d 331, 335 (Tenn. 2008) (citing Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence and the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence are questions primarily for the jury. Dorantes, 331 S.W.3d at 379 (citing State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006)). When considering the sufficiency of the evidence, this court may not substitute its inferences for those drawn by the trier of fact in cases involving circumstantial evidence. State v. Sisk, 343 S.W.3d 60, 65 (Tenn. 2011) (citing State v. Lewter, 313 S.W.3d 745, 748 (Tenn. 2010)).

Tina and Gregory Nelson were convicted of first degree felony murder and aggravated child abuse. As pertinent to this case, first degree felony murder is defined as the "killing of another committed in the perpetration of or attempt to perpetrate . . . aggravated child abuse[.]" T.C.A. § 39-13-202(a)(2) (2010). A person commits the offense of aggravated child abuse when he or she "knowingly, other than by accidental means, treats a child under eighteen (18) years of age in such a manner as to inflict injury" and "serious bodily injury to the child" results. Id. §§ 39-15-401(a), 402(a)(1) (2010). If the abused child is eight years of age or less, as the victim was in this case, the offense is a Class A felony. Id. § 39-15-402(b) (2010).

Aggravated child abuse is a nature-of-conduct offense, which means that "the evidence must be sufficient for a rational jury to have concluded, beyond a reasonable doubt, that the defendant was aware of the nature of his conduct when he treated the victim in such a manner as to inflict injury, and that, in so doing, he acted other than by accidental means." Dorantes, 331 S.W.3d at 386 (citing Hanson, 279 S.W.3d at 277); see State v. Ducker, 27 S.W.3d 889, 897 (Tenn. 2000) (holding that the evidence was sufficient to sustain the convictions for aggravated child abuse when the proof showed that the defendant "knowingly parked her car, rolled up the windows, securely fastened the children in the car, locked the car and left them inside . . . from approximately 3:45 a.m. to between 12 and 1 p.m." regardless of whether the defendant was aware that her conduct would cause the children's hyperthermia). In order to sustain a conviction for

first degree felony murder, the State was not required to prove a culpable mental state except that culpable mental state necessary to commit the underlying offense of aggravated child abuse.  See T.C.A. § 39-13-202(b) (2010).

The State's theory at trial was that (1) either Tina Nelson or Gregory Nelson or both of them were responsible as a principal for the aggravated child abuse offense that resulted in the victim's death or (2) that either Tina Nelson or Gregory Nelson was criminally responsible for the acts of the other who committed the aggravated child abuse offense that resulted in the victim's death.   The record indicates that the jury was instructed on criminal responsibility for both Tina and Gregory Nelson and that the jury was charged with the following two conditions for criminal responsibility:

> A person is criminally responsible for an offense committed by the conduct of another, if:
>
> . . .
>
> (2) Acting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense; or
>
> (3) Having a duty imposed by law or voluntarily undertaken to prevent commission of the offense and acting with intent to benefit in the proceeds or results of the offense, or to promote or assist its commission, the person fails to make a reasonable effort to prevent commission of the offense.

Id. § 39-11-402 (Supp. 2010).

Criminal responsibility is not a distinct crime but "a theory by which the state may prove the defendant's guilt based on another person's conduct."  State v. Osborne, 251 S.W.3d 1, 16 (Tenn. Crim. App. 2007) (citing State v. Mickens, 123 S.W.3d 355, 389-90 (Tenn. Crim. App. 2003)).   In the theory of criminal responsibility, "an individual's presence and companionship with the perpetrator of a felony before and after the commission of an offense are circumstances from which his or her participation in the crime can be inferred."  State v. Watson, 227 S.W.3d 622, 639 (Tenn. Crim. App. 2006) (citing State v. Ball, 973 S.W.2d 288, 293 (Tenn. Crim. App. 1998)).   In this situation, "[n]o particular act need be shown, and the defendant need not have taken a physical part in the crime to be held criminally responsible."  Id. (citing Ball, 973 S.W.2d at 293)).   There is no requirement that the State "elect between prosecution as a principal actor and prosecution for criminal responsibility[.]"  State v. Hodges, 7 S.W.3d 609, 625 (Tenn.

Crim. App. 1998) (citing State v. Williams, 920 S.W.2d 247, 257-58 (Tenn. Crim. App. 1995)).

**A. Tina Nelson.** Tina argues there was no evidence that she committed any act that injured the victim. She also argues she could not have known about the victim's internal injuries because the victim had no external signs of trauma. Finally, Tina asserts that the jury failed to give sufficient weight to Dr. Steinberg's testimony showing that her IQ of 53 prevented her from forming the required culpable mental state for the charged offenses and prevented her from forming the intent required to be criminally responsible for any act committed by Gregory Nelson.

First, Tina Nelson argues that there was no proof showing she committed any act that injured the victim. She claims that the evidence established that the victim, who was born prematurely, had major health problems from birth that caused her death. We note that although the victim was born prematurely, had a low birth weight, had trouble retaining body heat, and had some evidence of a brain abnormality, the proof at trial established that the victim did not have any intracranial hemorrhages and was healthy enough to be discharged from the hospital.

Despite Tina's claim that the victim was born with health problems that caused her death, the medical proof shows that the victim's injuries were the result of inflicted trauma. Dr. Laboy testified that he observed a small abrasion on the victim's nose and a small bruise from a recent injury under her jaw, which was an unusual place for a bruise because this is a protected area not likely to be injured during a fall. Dr. Laboy also found subdural hemorrhages on the left and the right side of the victim's brain as well as a patchy subarachnoid hemorrhage on the top of the victim's brain. He explained that some of the victim's brain hemorrhages were old injuries that had occurred in the past where the blood was reabsorbing and some were new injuries that had just recently occurred. Although he acknowledged that there could be natural causes for hemorrhages of this type, Dr. Laboy opined, after reviewing the victim's medical records and performing the autopsy, that the victim's brain hemorrhages were from a "traumatic injury." He sent the victim's brain slides to a neuropathologist, who also opined that the victim's brain hemorrhages were not from natural causes. Although the victim's skull was not fractured, Dr. Laboy stated that an impact to a victim's head might not cause a fracture because the bones of the skull are softer and the blood can cause the bones of the skull to become expanded before the infant eventually develops symptoms of lethargy, convulsions, or aspirations that can result in death.

Although Dr. Laboy acknowledged that infants can survive trauma to the brain, the victim had evidence of an old brain injury and then a rebleeding over that area that likely resulted in her death by causing an aneurysm, a seizure, or an inability to get

oxygen. He said it was unlikely that the victim's brain injuries were more than a month to a month-and-a-half old and concluded that the victim's cause of death was a closed head injury. In addition to the brain hemorrhages, Dr. Laboy observed recent perioptic hemorrhages between the sheath and the optic nerve of both of the victim's eyeballs, which were caused by traumatic injury causing the brain to collapse and blood to accumulate in that area. He also observed a recent retinal hemorrhage in the victim's left eye, which he believed was also caused by traumatic injury. Dr. Laboy also noted that the victim had healing fractures on six ribs on the left lateral side, eight ribs on the left posterior side, and five ribs on the right lateral side. He stated that these healing fractures could have been the result of a single event and looked to be less than a month old. He also observed a recent refracture on the ninth left posterior rib with blood around it. He stated that victim's fractured ribs were consistent with a squeezing type of inflicted trauma. In his autopsy report, Dr. Laboy stated that the existence of the victim's rib fractures raised the "index of suspicion that the acute intracranial hemorrhage [was] traumatic in nature." Moreover, Dr. Laboy testified that the victim had brain hemorrhages, multiple fractures to her ribs, perioptic hemorrhages behind both eyeballs, and a hemorrhage inside one of her eyes that were the result of traumatic injury. This testimony refuted the claims made by Tina and Gregory Nelson that the victim was injured in any of the ways they suggested. Although Dr. Laboy acknowledged that the victim had no external signs of force or trauma at the time of the autopsy, he stated that the victim would not have had any bruises if she had been thrown onto something soft like a mattress or if her bruises had healed over time. Based on this evidence, a rational jury could have inferred that the victim's injuries were from inflicted trauma rather than from natural or accidental causes.

As to Tina's claim that there was no evidence that she injured the victim, we find Derrell F. Nunn persuasive. See State v. Derrell F. Nunn, No. E2007-02333-CCA-R3-CD, 2009 WL 4790211 (Tenn. Crim. App. Dec. 14, 2009). In that case, the defendants, who were the parents of the nine-month old victim, were the sole custodians during a time period in which the victim suffered a subdural hematoma that resulted in brain damage, retinal hemorrhages, a liver laceration, a bruised kidney, an injured pancreas, and fractures to his skull, arm, and leg. Id. at *24-25. The jury was instructed on criminal responsibility for each defendant based on the parents' duty to protect their children from child abuse, see Hodges, 7 S.W.3d at 623, and the defendants were subsequently convicted of aggravated child abuse. Id. at *25. On appeal, this court held that "[a] rational jury could find beyond a reasonable doubt that in the light most favorable to the State, one or both Defendants inflicted the injuries on their child before calling 9-1-1 on September 5, 2002, and if either Defendant did not inflict the injuries, that Defendant was criminally responsible because he or she failed to make a reasonable effort to prevent the beating." Id. at *24. In reaching this conclusion, the court noted that

the evidence established that the victim's near fatal injuries were inflicted while the defendants were the victim's sole caregivers.  Id. at *25.

Although Tina claims that there was no evidence that she injured the victim, there was substantial circumstantial evidence presented at trial that Tina was either principally responsible for injuring the victim or was criminally responsible for Gregory Nelson's acts in injuring the victim.  The proof, when viewed in the light most favorable to the State, established that Tina Nelson and Gregory Nelson had the sole care and custody of the victim prior to her death.  Although Irene Nelson cared for the victim for a few hours on Easter Sunday, neither Tina nor Gregory claimed that Irene Nelson caused the victim's injuries.  Pat Harwell and Zandra Carter-Mann testified that Tina and Gregory Nelson did not visit the victim at the hospital until after they were told that they would not be able to take the victim home.  Dawn Hemby and Kim Coffee testified that on April 20, 2011, they observed a blood spot on the victim's eye and urged the Nelsons to take the victim to the doctor.  In addition, they noticed that the victim on that date did not laugh, smile, or show emotion and never reacted to her environment, which greatly concerned them.  Irene Nelson testified that on April 24, 2011, the victim was extremely difficult to awaken and would not stop crying after she fed her.

Most importantly, while Gregory testified that he could have caused the victim's rib fractures by administering CPR to her the day of her death, he was unable to explain how the victim had both new and old rib fractures.  Despite Tina's and Gregory's various explanations for the victim's injuries, including the possibility that the victim received her injuries when R.C. pushed Tina down while she was holding the victim or that Timothy Nelson caused the victim's injuries, the jury, in convicting Tina and Gregory Nelson of the charged offenses, clearly chose to accredit the testimony of the State's witnesses over the testimony from Tina and Gregory Nelson, and we are precluded from reevaluating the credibility of any of the witnesses who testified.  Sisk, 343 S.W.3d at 65 (citing Lewter, 313 S.W.3d at 748); Campbell, 245 S.W.3d at 335.  Accordingly, we conclude that the evidence was sufficient to sustain Tina Nelson's and Gregory Nelson's convictions for first degree felony murder and aggravated child abuse.  In reaching this conclusion, we note that the dual convictions in this case do not violate the protections against double jeopardy.  See State v. Watkins, 362 S.W.3d 530, 548 (Tenn. 2012) (citing State v. Denton, 938 S.W.2d 373, 379 n.14 (Tenn. 1996); State v. Godsey, 60 S.W.3d 759, 778 (Tenn. 2001)).

Second, Tina claims that she could not have known about the victim's internal injuries because the victim had no "external signs of force or trauma" consistent with her internal injuries and because no other tests performed on the victim were as accurate as the victim's autopsy in determining that the victim had intracranial hemorrhages.  We reiterate that aggravated child abuse is a nature-of-conduct offense.  Consequently, the

evidence must be sufficient for a rational jury to have concluded, beyond a reasonable doubt, that Tina was aware of the nature of her conduct when she treated the victim in such a manner as to inflict injury, and that, in so doing, she acted other than by accidental means. See Dorantes, 331 S.W.3d at 386; Ducker, 27 S.W.3d at 896. Based on the proof presented at trial, a rational jury could have found that Tina knowingly hit, slapped, or kicked the victim, or was criminally responsible for Gregory's acts in knowingly hitting, slapping, or kicking the victim. Such a finding is sufficient to support the convictions in this case, even if Tina and Gregory were not aware that these acts would result in serious bodily injury and death to the victim.

Finally, Tina argues that the jury failed to give sufficient weight to Dr. Steinberg's testimony showing that her IQ of 53 prevented her from forming the required culpable mental state for the charged offenses and prevented her from forming the intent necessary to be held criminally responsible for Gregory Nelson's acts. Although Gregory did not present any expert testimony regarding the required mental states for the offenses, Tina offered testimony from Dr. Fred Steinberg, an expert in the field of forensic psychology.

"'[P]sychiatric evidence that the defendant lacks the capacity, because of mental disease or defect, to form the requisite culpable mental state to commit the offense charged is admissible under Tennessee law.'" State v. Faulkner, 154 S.W.3d 48, 56 (Tenn. 2005) (quoting State v. Hall, 958 S.W.2d 679, 689-90 (Tenn. 1997)); see State v. Phipps, 883 S.W.2d 138, 149 (Tenn. Crim. App. 1994) (stating that a defendant may introduce proof, including expert testimony, regarding his mental state for the purpose of negating the requisite culpable mental state for the charged offense); State v. Shelton, 854 S.W.2d 116, 122 (Tenn. Crim. App. 1993) (holding that a defendant may present "competent evidence, usually expert testimony, of his impaired mental condition to show that he was incapable of forming a criminal intent, even though he was not insane"); T.C.A. § 39-11-201(a)(2) (Supp. 2010) (stating that no person may be convicted of an offense unless the culpable mental state required is proven beyond a reasonable doubt). While the use of such evidence is not a defense to a crime, it is a rule of evidence that allows proof of the defendant's mental condition to negate the requisite culpable mental state. Hall, 958 S.W.2d at 688-89. In other words,

> diminished capacity is not considered a justification or excuse for a crime, but rather an attempt to prove that the defendant, incapable of the requisite intent of the crime charged, is innocent of that crime but most likely guilty of a lesser included offense. United States v. Cameron, 907 F.2d 1051, 1067 (11th Cir. 1990). Thus, a defendant claiming diminished capacity contemplates full responsibility, but only for the crime actually committed. State v. Padilla, 347 P.2d 312 (N.M.1959). In other words, "diminished

capacity" is actually a defendant's presentation of expert, psychiatric evidence aimed at negating the requisite culpable mental state.

Id. at 688.

An expert's testimony in the form of an opinion is not objectionable merely because it concerns an ultimate issue to be determined by the trier of fact. See State v. Shuck, 953 S.W.2d 662, 668-69 (Tenn. 1997) (citing City of Columbia v. C.F.W. Const. Co., 557 S.W.2d 734, 742 (Tenn. 1977)); see also Tenn. R. Evid. 704. "In Tennessee the only ultimate issue about which an expert explicitly cannot offer an opinion is whether the defendant was or was not sane at the time of commission of the criminal offense." Shuck, 953 S.W.2d at 663 n.3. Therefore, it is appropriate for experts to testify regarding the ultimate issue in a case involving diminished capacity, that is, whether because of the defendant's mental disease or defect, he was unable to act intentionally, knowingly, recklessly or with premeditation. See State v. Robert Austin, No. W2005-01963-CCA-R3-CD, 2007 WL 2624399, at *5 (Tenn. Crim. App. Sept. 10, 2007); State v. Antonio D. Idellfonso-Diaz, M2006-00203-CCA-R9-CD, 2006 WL 3093207, at *4 (Tenn. Crim. App. Nov. 1, 2006). An expert must show: (1) the defendant had a mental disease or defect, and (2) the defendant's inability to form the requisite culpable mental state was because of the defendant's mental disease or defect, rather than the defendant's emotional state or mental condition. See Hall, 958 S.W.2d at 689, 691; Robert Austin, 2007 WL 2624399, at *5. "It is the showing of a lack of capacity to form the requisite culpable mental intent that is central to evaluating the admissibility of expert psychiatric testimony on the issue." Hall, 958 S.W.2d at 690 (citing Shelton, 854 S.W.2d at 122).

Although the trial court had no duty to instruct the jury that it may consider proof negating the requisite mental state, the record indicates that the trial court in this case did, in fact, instruct the jury regarding this issue. See State v. Grose, 982 S.W.2d 349, 353-54 (Tenn. Crim. App. 1997) (stating that the trial court had no duty to instruct the jury that the defendant's diminished capacity could be considered in determining whether he was capable of forming the requisite mental state for the offense); State v. Rutherford, 876 S.W.2d 118, 121 (Tenn. Crim. App. 1993) (holding that a special instruction was unnecessary because "[t]he effect that the defendant's mental retardation would have on his ability to form the culpable mental state was just another circumstance for the jury to consider in determining if the defendant in fact possessed the required mental state").

After the close of proof and prior to closing arguments, the trial court stated that it planned to charge the following special jury instruction regarding Tina Nelson's culpable mental state:

The defendant's capacity to form the requisite mental state to commit an offense is an issue in criminal prosecutions because the general criminal law in Tennessee provides that no person may be convicted of an offense unless the culpable mental state required is proven beyond a reasonable doubt. The effect that the defendant's mental disorder or mental retardation would have on her ability to form the culpable mental state is just another circumstance for the jury to consider in determining if the defendant, in fact, possessed the required mental state. The State must prove beyond a reasonable doubt the culpable mental state for the accused. Culpable mental state means the state of mind of the accused at the time of the offense. This means that you must consider all of the evidence to determine the state of mind of the accused at the time of the commission of the offense. The state of mind which the State must prove is contained in the elements of the offenses as outlined in these instructions. You can refer to instructions and element[s] of the offenses. Some require intentional, knowing, or recklessly.

In this case you have heard evidence that the defendant might have suffered from a mental disease or . . . mental defect or condition which could have affected her capacity to form the culpable mental state required to commit a particular offense. If you find from the evidence that the defendant's capacity to form the culpable mental state may have been affected, then you must determine beyond a reasonable doubt what the mental state of the defendant was at the time of the commission of the offense to determine which, if any, offense she may be guilty of.

We conclude that the aforementioned instruction is substantially the same as Tennessee Criminal Pattern Jury Instruction 42.22. See 7 Tenn. Prac. Pattern Jury Instr. T.P.I.—Crim. 42.22 (18th ed. 2014). After the trial court indicated that it was going to provide the above instruction, both parties requested a photocopy of the instruction so they could review it before the jury was charged the following day. The next day, the prosecutor and the defense attorneys for Tina and Gregory Nelson stated that this proposed charge was acceptable.[5]

In State v. Robert Austin, this court considered whether the trial court erred in ruling that the defense's expert, a clinical psychologist, could not testify about the defendant's capacity to form the requisite intent for the charged offenses. Robert Austin, No. W2005-01963-CCA-R3-CD, 2007 WL 2624399, at *1 (Tenn. Crim. App. Sept. 10, 2007). The court noted that although the expert testified that the defendant's mental

_____

[5] The record does not include the portion of the transcript showing the trial court's instructions to the jury or a written copy of the jury instructions given by the trial court in this case.

disease "impacted his capacity" to form the requisite culpable mental state, the expert failed to state that the defendant was incapable of forming the required mental state because of his mental disease.  Id. at *5.  Although this court concluded that the trial court erred in ruling that the expert's testimony was inadmissible, it held that the trial court's ruling was harmless because the expert's testimony failed to show that the defendant was incapable of forming the requisite culpable mental state for the offense because of his mental disease.  Id. at *6.

In State v. Antonio D. Idellfonso-Diaz, an interlocutory appeal, the State argued that the trial court erred in ruling the defendant could present expert testimony that he lacked the mental capacity required for the offenses.  Antonio D. Idellfonso-Diaz, No. M2006-00203-CCA-R9-CD, 2006 WL 3093207, at *1 (Tenn. Crim. App. Nov. 1, 2006).  At a pretrial hearing, the expert testified that the defendant was suffering from severe psychiatric disorders at the time of the offenses.  Id.  While the expert testified that the defendant's capacity to form the mental states was "impaired to some extent," he did not specifically testify that the defendant lacked the capacity to premeditate or act intentionally because of a mental disease or defect.  Id. at *4.  This court concluded that the expert's testimony was irrelevant and inadmissible, stating, "The fact that the [defendant's] mental disease impaired or reduced his capacity to form the requisite mental state does not satisfy the two-prong requirement in Hall and Faulkner."  Id.

After carefully reviewing the expert testimony presented in this case, we conclude that Dr. Steinberg's testimony failed to establish that Tina Nelson lacked the requisite mental state for the offenses because of a mental disease or defect.  Unlike the experts in Robert Austin and Antonio D. Idellfonso-Diaz, Dr. Steinberg's testimony did not go even so far as to state that Tina Nelson's mental disease or defect impacted or reduced her capacity to form the requisite mental state.  While Dr. Steinberg's testimony sufficiently established that Tina had a mental disease or defect, it failed to show that Tina was incapable of forming the requisite culpable mental state because of this mental disease or defect.  For this reason, a rational jury could have found that Dr. Steinberg's testimony was not entitled to any weight, particularly in light of the testimony from Carter-Mann that Tina was able to sign DCS paperwork, participate in meetings, and schedule appointments for her children and the testimony from Dawn Hemby that Tina appeared capable of taking care of herself and her children.

The jury in this case convicted Tina Nelson of the charged offenses rather than any lesser included offenses.  Although Tina presented evidence attempting to negate her capacity to form the requisite mental state and the jury was specifically instructed on this issue, the jury found, beyond a reasonable doubt, that Tina either possessed the mental state required for the charged offenses or was criminally responsible for the acts committed by Gregory Nelson in the commission of these offenses.

- 41 -

Therefore, we conclude, based on the specific proof presented in this case, that the evidence failed to establish that Tina Nelson lacked the capacity to form the requisite mental states for these offenses. In reaching this conclusion, we decline to make a blanket statement that a person's IQ will never affect his or her capacity to form the requisite culpable mental state. Each case must turn on the particular evidence presented. However, because the evidence presented in this case is sufficient to sustain Tina Nelson's convictions for first degree felony murder and aggravated child abuse, she is not entitled to relief.

**B. Gregory Nelson.** Gregory Nelson argues that he and Tina could not have knowingly injured the victim because the victim's injuries could have only been observed by a trained medical professional prior to the autopsy. As support, he cites Dr. Laboy's testimony that no one, other than an ophthalmologist or optometrist who dilated the victim's eye and looked inside it, could have observed the injuries to the victim's eye. Gregory also claims that Jeremy Booker's testimony regarding Gregory's admission to physically abusing the victim was at odds with the testimony from Dr. Laboy and Sheriff Sanders that there were no external, observable injuries to the victim. While Gregory acknowledges that "either or both of them might have been reckless or negligent with regard to seeking medical care" for the victim based on their poverty and intellectual disabilities, he contends that neither he nor Tina Nelson acted knowingly in inflicting serious bodily injury to the victim.

We again emphasize that aggravated child abuse is a "nature of conduct" crime, and, therefore, the evidence must be sufficient for a rational jury to have concluded, beyond a reasonable doubt, that Gregory was aware of the nature of his conduct when he treated the victim in such a manner as to inflict injury, and that, in so doing, he acted other than by accidental means. See Dorantes, 331 S.W.3d at 386; Ducker, 27 S.W.3d at 896. In other words, the State did not have to show that Gregory Nelson knew his actions would injure the victim, only that he knowingly committed the act or acts that caused the serious bodily injury that resulted in the victim's death. Given the evidence presented at trial, a rational jury could have found that Gregory knowingly hit, slapped, or kicked the victim, or was criminally responsible for Tina's acts in knowingly hitting, slapping, or kicking the victim. As we previously held, such a finding is sufficient to support the convictions in this case, even if Tina and Gregory were not aware that these acts would result in serious bodily injury and death to the victim.

The jury in this case convicted Gregory Nelson of charged offenses, first degree felony murder and aggravated child abuse, rather than any of the lesser included offenses. While Tina Nelson presented expert evidence attempting to negate the requisite culpable mental state for these offenses, Gregory presented no such proof, and the jury declined to convict him of any lesser offenses. Although Gregory claims that the jury was precluded

from considering any lesser included offenses that that might have stemmed from "reckless or negligent behavior on the part of either parent," the record shows that the jury was instructed on facilitation of murder in the first degree, murder in the second degree, facilitation of murder in the second degree, reckless homicide, facilitation of reckless homicide, child abuse, facilitation of child abuse, criminally negligent homicide, and facilitation of criminally negligent homicide as lesser included offenses of first degree felony murder. In addition, the record shows the jury was instructed on facilitation of aggravated child abuse, aggravated assault, facilitation of aggravated assault, reckless aggravated assault, facilitation of reckless aggravated assault, child abuse, facilitation of child abuse, reckless endangerment, and assault as lesser included offenses of aggravated child abuse. The record is devoid of any evidence that the jury was prevented from considering these lesser included offenses, including those offenses requiring a reckless or negligent mental state. Because the evidence is sufficient to sustain Gregory Nelson's convictions for aggravated child abuse and first degree felony murder, he is not entitled to relief.

Secondly, Gregory Nelson claims that even if Booker's relatively weak testimony was true, none of the acts recounted by Booker "produced a single 'serious' bodily injury" required for aggravated child abuse." In challenging the credibility of Booker's testimony, Gregory asserts that Booker was unable to remember the exact date Gregory made these admissions, could not provide a detailed description of the person in the dark suit to whom Gregory was talking when he made these statements, and did not hear both sides of the conversation or the entire conversation between Gregory Nelson and the man in the dark suit. Gregory further asserts that although Booker claimed he reported Gregory's admission immediately, the investigators in this case waited ten or eleven weeks before obtaining "a vague statement" from Booker about what he overheard. Finally, Gregory attacks Booker's credibility by asserting that the State never attempted to locate the man in the dark suit and never refuted Nelson's claim that the only man he talked to in jail was attorney Richard McFall.

We conclude that the proof is sufficient to support a finding that the victim suffered serious bodily injury. "Serious bodily injury" is defined as bodily injury that involves any one of the following:

(A) A substantial risk of death;

(B) Protracted unconsciousness;

(C) Extreme physical pain;

(D) Protracted or obvious disfigurement;

(E) Protracted loss or substantial impairment of a function of a bodily member, organ or mental faculty; or

(F) A broken bone of a child who is twelve (12) years of age or less[.]

T.C.A. § 39-11-106(a)(34) (Supp. 2010). "Bodily injury" is defined as "a cut, abrasion, bruise, burn or disfigurement, and physical pain or temporary illness or impairment of the function of a bodily member, organ, or mental faculty[.]" Id. § 39-11-106(a)(2) (Supp. 2010).

Although Gregory claims that none of the acts recounted by Booker produced a single serious bodily injury required for a conviction for aggravated child abuse, the medical testimony shows otherwise. Dr. Laboy opined that the subdural hemorrhages on the left and the right side of the victim's brain, the subarachnoid hemorrhage on the top of the victim's brain, the perioptic hemorrhages between the sheath and the optic nerve of both of the victim's eyeballs, and the retinal hemorrhage inside the victim's left eye were all the result of traumatic injury. He also noted that the victim had healing fractures on six ribs on the left lateral side, eight ribs on the left posterior side, and five ribs on the right lateral side that were consistent with a squeezing type of inflicted trauma. Moreover, Dr. Laboy stated that the victim had evidence of an old brain injury and then a rebleeding over that area that likely caused the victim's death by causing an aneurysm, a seizure, or an inability to get oxygen. We have already concluded that the proof showed the victim's injuries were from inflicted trauma rather than natural or accidental causes and that the proof is sufficient to support Gregory Nelson's convictions. Accordingly, he is not entitled to relief.

## CONCLUSION

The evidence is sufficient to sustain the convictions in this case, and the judgments of the trial court are affirmed.

_____
CAMILLE R. MCMULLEN, JUDGE

- 44 -